IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | |
| v. | Case No. 22-20066-01-DDC |
| **SCOTT PLUMMER,** | |
| Defendant. | |

**MEMORANDUM AND ORDER**

This matter comes before the court on defendant Scott Plummer's Motion to Suppress Evidence (Doc. 29). Mr. Plummer asks the court to suppress (1) statements he made outside the Robert J. Dole United States Courthouse and (2) statements he made during an interrogation at the Kansas City, Kansas Police Department. Doc. 29 at 1, 2. Mr. Plummer contends that officers secured his statements in a manner violating his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). *Miranda* rights attach when law enforcement interrogates someone who is in custody. The government counters, contending that the officers didn't custodially interrogate Mr. Plummer, and thus, owed no duty to read Mr. Plummer's *Miranda* rights. Doc. 30 at 4. Alternatively, the government argues, officers had reasonable suspicion to conduct a *Terry* Stop and detain Mr. Plummer without reading his *Miranda* rights. *Terry v. Ohio*, 392 U.S. 1 (1968); Doc. 31 at 1, 2.

The court held an evidentiary hearing on August 7, 2023. For reasons explained below, the court denies Mr. Plummer's Motion to Suppress (Doc. 29).

I.      **Factual Background**

The court took evidence during the August 7, 2023, hearing and derives the following factual findings from evidence presented at that hearing.

Defendant Scott Plummer's Motion to Suppress (Doc. 29) centers on Federal Protective Services ("FPS") Officer Thaddeus Debolt's allegedly unlawful custodial interrogation of Mr. Plummer on November 29, 2022.

On November 29, 2022, sometime before 9:00 a.m., security officers discovered fire damage on the east exterior side of the Robert J. Dole United States Courthouse and informed Officer Debolt.  Officers Debolt and William Wiederholt then arrived at the Courthouse.  The Courthouse security officers showed Officer Debolt video surveillance footage, which captured the Courthouse's exterior.  The video footage depicted a white male, wearing dark clothing and carrying a gray duffel bag and a black backpack.  The man in the video loitered around the east side of the Courthouse, then eventually left.  At ABOUT 9:00 a.m., Officer Debolt called officers with the Bureau of Alcohol Tobacco, Firearms and Explosives ("ATF") Certified Fire Investigators to come to the Courthouse and investigate the fire damage.  At approximately 10:30 a.m., Senior ATF Special Agent Ryan Zornes arrived at the Courthouse.  ATF Special Agents Belinda Perez and Cody Frye also arrived at the scene.  Officer Debolt debriefed Agent Zornes about the fire and described the video surveillance footage.  Officer Debolt and Agent Zornes inspected the Courthouse for fire damage and returned to Agent Zornes's vehicle, parked on State Avenue in front of the Courthouse.  While walking from the Courthouse to Agent Zornes's truck, Agent Zornes and Officer Debolt observed a man—Mr. Plummer, they later discovered—walking towards them.  This man fit the description of the man captured in the surveillance video.

2

At 11:08 a.m., Officer Debolt and Agents Zornes and Frye approached Mr. Plummer at the corner of Fifth Street and State Avenue. They stood at a conversational distance.[1] Officer Debolt asked Mr. Plummer three questions:

- Were you in the area last night?
- Were you hanging out down the stairs next to the federal building?
- Did you start a fire down there?

Mr. Plummer answered yes to each question. Officer Debolt and Agents Zornes and Frye didn't introduce themselves as law enforcement officers. They didn't tell Mr. Plummer that he could leave or not answer their questions. Officer Debolt wore his FPS uniform, with his firearm exposed. Agent Zornes wore a "pullover hoodie" bearing an ATF emblem, with his firearm exposed. Agent Frye wore street clothes without identifiable law enforcement insignia and no exposed firearm.

Some four minutes after Officer Debolt and Agents Zornes and Frye initially contacted Mr. Plummer, they placed Mr. Plummer under arrest. Officer Debolt and Agents Zornes and Frye didn't touch or restrain Mr. Plummer until they arrested him. Before the arrest, the officers didn't retain any of Mr. Plummer's belongings or take his identification. During the arrest, Officer Wiederholy and Agent Perez joined the group. Officers Debolt and Wiederholt then transported Mr. Plummer to the Kansas City, Kansas Police Department ("KCKPD").

Around 1:30 p.m. on that same day, Agents Zornes and Perez interviewed Mr. Plummer in a KCKPD interview room. Agent Zornes read Mr. Plummer his *Miranda* rights. Mr.

---

[1] Agent Perez and Officer Wiederholt didn't initially join Officer Debolt and Agents Zornes and Frye when they approached Mr. Plummer.

3

Plummer voluntarily waived his rights and agreed to speak to Agents Plummer and Perez. During the interview, Mr. Plummer again admitted to starting a fire at the Courthouse.

Following these events, the United States charged Mr. Plummer with one count of Malicious Damage to Federal Property, violating 18 U.S.C. § 844(f)(1).  Doc. 11.

**II.     Analysis**

Mr. Plummer moves to suppress the statements he made to Officer Debolt during their initial contact outside the Courthouse.  Doc. 29 at 4–7.  Mr. Plummer contends that Officer Debolt secured the statements in a manner violating his Fifth Amendment rights.  *Id.*

The Fifth Amendment's Self Incrimination Clause guarantees that "[n]o person . . . shall be compelled in any criminal case to be witness against himself."  U.S. Const. amend. V.  In *Miranda v. Arizona*, the Supreme Court explained that "the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work . . . to compel him to speak where he would not otherwise do so freely."  384 U.S. at 467.  To combat these inherent pressures, the Court held that officers, before custodial questioning, must warn a suspect:

> that [the suspect] has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479.  The "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  *Id.* at 444.

But, as the Tenth Circuit has explained, "*Miranda* warnings aren't always required." *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 785 (2022) (Mem.).  Officers must give *Miranda* warnings to suspects only when the individual is (1)

4

in "custody" and (2) subject to "interrogation."  *United States v. Cortez*, 965 F.3d 827, 840 (10th Cir. 2020) (citation and internal quotation marks omitted).

Mr. Plummer asks the court to suppress the following evidence:  (1) Mr. Plummer's statements responding to Officer Debolt's three questions outside the Courthouse; and (2) Mr. Plummer's statements to Agent Zornes at KCKPD.  Doc. 29 at 1.  Mr. Plummer argues that Officer Debolt custodially interrogated him without first informing him of his *Miranda* rights.  Thus, Mr. Plummer argues, the court should suppress his involuntary admissions.  *Id.* at 13.  Mr. Plummer also argues that the court should suppress his involuntary statements made during the KCKPD interview with Agent Zornes, too.  *Id.* at 16.  Mr. Plummer argues that even though he waived his *Miranda* rights during the interview, the court should exclude his admissions because the officers engaged in a two-step interrogation strategy deliberately aimed at thwarting *Miranda*.  *Id.* at 15.

The government disagrees.  It argues that Mr. Plummer voluntarily confessed during a consensual encounter with Officer Debolt outside the Courthouse.  Doc. 30 at 4, 5.  Alternatively, the government argues, even if the court finds Officer Debolt's initial questioning amounted to "custodial interrogation," then the officers still had no duty to read Mr. Plummer his *Miranda* rights.  It reasons that the officers had reasonable suspicion to justify detaining Mr. Plummer in a *Terry* Stop.  Doc. 31 at 1.  And since an officer needn't inform a suspect of his *Miranda* rights during a *Terry* Stop, Mr. Plummer voluntarily consented to answering Officer Debolt's questions.

The court addresses each argument, below.

### A. Mr. Plummer's Statements Outside the Courthouse

Law enforcement officers trigger a person's *Miranda* rights when they: (1) take the person into custody and (2) interrogate that person. To determine whether Mr. Plummer's *Miranda* rights attached during his conversation with Officer Debolt during their initial contact outside the Courthouse, the court considers each element, in turn, below.

### 1. Custody

"An officer's obligation to administer *Miranda* warnings attaches . . . only where there has been such a restriction on a person's freedom as to render him in custody." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam). An encounter is custodial if, under all the circumstances, a "'reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.'" *United States v. Berres*, 777 F.3d 1083, 1092 (10th Cir. 2015) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)). "The determination of whether a defendant was in custody for purposes of *Miranda* is based on the totality of the circumstances; thus, it is necessarily fact intensive." *United States v. Bautista*, 145 F.3d 1140, 1146 (10th Cir. 1998). To evaluate the totality of the circumstances and apply the reasonable person standard, the court considers our Circuit's, "non-exhaustive list of factors:"

> (1) the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers;
>
> (2) whether the officers touch or physically restrain the defendant;
>
> (3) whether the officers are uniformed or in plain clothes;
>
> (4) whether their weapons are displayed;
>
> (5) the number, demeanor and tone of voice of the officers;
>
> (6) whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and

>    (7) whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*United States v. Woody*, 45 F.4th 1166, 1174 (10th Cir. 2022) (brackets omitted).

These factors, on balance, counsel against granting Mr. Plummer's Motion to Suppress (Doc. 29). *First*, the encounter occurred on an open, public street corner. *Second*, the officers didn't physically touch or restrain Mr. Plummer until after he'd admitted starting the fire—the officers then arrested him. *Third*, while Officer Debolt wore his police uniform, Agents Zornes and Frye wore plain clothes. The ATF emblem on Agent Zornes's hoodie doesn't resemble a law enforcement uniform. *Fourth*, Officer Debolt and Agent Zornes wore exposed firearms. But they never unholstered them or displayed them assiduously. *Fifth*, Agent Zornes testified that Mr. Plummer and the officers spoke casually during the Courthouse encounter. *Sixth*, the conversation merely lasted minutes, during which the officers did not confiscate or control Mr. Plummer's identification or his bags. And *seventh*, the officers didn't advise Mr. Plummer that he needn't respond to their questions or that he could leave.

In sum, while factors four and seven favor Mr. Plummer, factor three cuts in both directions, and the remaining factors overwhelmingly support the government. Thus, the court finds that Mr. Plummer consented to Officer Debolt's questions outside the Courthouse. So, law enforcement didn't take Mr. Plummer into custody, and his *Miranda* rights didn't attach during this initial encounter outside the Courthouse.

### 2. Interrogation

A defendant must be both interrogated and in custody for his *Miranda* rights to attach. *Cortez*, 965 F.3d at 840. Having concluded that Mr. Plummer wasn't in custody—failing a necessary prong—judicial restraint counsels against deciding whether the interaction constitutes

interrogation. Simply put, the court need not decide whether Officer Debolt interrogated Mr. Plummer outside the Courthouse because he wasn't in custody.

### B.   Mr. Plummer's Statements in the Interrogation Room at the Kansas City, Kansas Police Department

Mr. Plummer also asks the court to suppress his statements to Agents Zornes and Perez at KCKPD. Doc. 29 at 14–16. He reasons that the government engaged in a deliberate two-step interrogation calculated to undermine *Miranda*. *Id.* at 15. Mr. Plummer argues that the first interrogation—his initial statements to Officer Debolt—violated his *Miranda* rights, and they contaminated the second interrogation. *Id.* at 16.

#### 1.   Whether Mr. Plummer's Statements Should be Suppressed Because Law Enforcement Acted to Deliberately Frustrate *Miranda*

Mr. Plummer's argument fails because Officer Debolt lawfully interacted with Mr. Plummer outside the Courthouse. And, though the officers didn't read Mr. Plummer his *Miranda* rights outside the Courthouse, both parties agree that Agent Zornes read Mr. Plummer his *Miranda* rights before the KCKPD interview began. Doc. 29 at 15; Doc. 30 at 9. The Supreme Court has held that the "subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Oregon v. Elstad*, 470 U.S. 298, 314 (1985). In other words, the government still may introduce unwarned statements provided that the suspect repeated the statements after officers had given the suspect his *Miranda* warnings. In *Elstad*, our Circuit has explained, the Supreme Court rejected the argument that the initial, unwarned statement creates a "lingering compulsion," corrupting the later, *Mirandized* statements. *See United States v. Carrizales–Toledo*, 454 F.3d 1142, 1149 (10th Cir. 2006) (quoting *Elstad*, 470 U.S. at 311)).

8

The Tenth Circuit uses the following standard to assess the "admissibility of confessions given subsequent to midstream *Miranda* warnings:"

> First, was the initial self-incriminating statement, though voluntary, obtained in violation of the defendant's *Miranda* rights? If not, there is no need to go further. If the initial statement was obtained in violation of the defendant's *Miranda* rights, has the government shown by a preponderance of the evidence that the questioning officer(s) did not engage in a deliberate two-step interrogation calculated to undermine *Miranda*? If so, the defendant's postwarning statement is admissible so long as it, too, was voluntary. If not, the postwarning statement is inadmissible unless the objective circumstances show that a reasonable person in the defendant's shoes would understand the import and effect of the midstream *Miranda* warnings.

*Guillen*, 995 F.3d at 1121 (internal citation omitted).

Mr. Plummer urges the court to apply a narrower test. His test would have the court decide whether there was a "'substantial break' in both 'time and circumstances' between the unwarned statement and the subsequent *Miranda* warning." Doc 29 at 14 (quoting *Guillen*, 995 F.3d at 1113). The proposed test considers whether the government took "specific, curative steps" to insulate the second, *Mirandized* interrogation from the first, unconstitutional interrogation. *Guillen*, 995 F.3d at 1113; *Seibert*, 542 U.S. at 621 (Kennedy, J., concurring).[2] But the court only may apply this test once it determines that an officer violated defendant's *Miranda* rights.

The problem with Mr. Plummer's approach is that the court already has decided that Mr. Plummer's statements to Officer Debolt didn't violate the defendant's *Miranda* rights. *See supra* § II.A. Accordingly, "there is no need to go further." *Guillen*, 995 F.3d at 1121. Thus, no basis exists to suppress Mr. Plummer's statements to Agent Zornes during the interview at KCKPD. That Officer Debolt didn't read Mr. Plummer his *Miranda* warnings outside the Courthouse is of

---

[2] While Justice Souter authored the plurality opinion, the Tenth Circuit interprets "Justice Kennedy's concurrence [as] the binding opinion from *Seibert*." *Guillen*, 995 F.3d at 1114.

no consequence. The court thus rejects Mr. Plummer's request to suppress his statements at KCKPD.

### B. Reasonable Suspicion to Stop

The government's Supplemental Brief (Doc. 31) makes an alternative argument. It maintains that Officer Debolt had reasonable suspicion to perform a *Terry* Stop. Doc. 31 at 1, 2. And since a *Terry* Stop is an "investigative detention,"—rather than a formal, custodial arrest—Office Debolt had no duty to read Mr. Plummer his *Miranda* rights during the Courthouse interaction. *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012).

Because the court already has concluded that the initial interaction wasn't a custodial interrogation, the court needn't evaluate this alternative argument. *See supra* § II.A.

## III. Conclusion

For the reasons explained above, the court denies Mr. Plummer's Motion to Suppress (Doc. 29).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion to Suppress (Doc. 29) is denied.

**IT IS SO ORDERED.**

**Dated this 18th day of September, 2023, at Kansas City, Kansas.**

>                     s/ Daniel D. Crabtree
>                     **Daniel D. Crabtree**
>                     **United States District Judge**